UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          - v. -                  :
                                       **09 Cr. 1244 (RJH)**
OUMAR ISSA,                       :
HAROUNA TOURÉ, and
IDRISS ABDELRAHMAN,               :

          Defendants.    :
- - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AND FOR PRETRIAL DISCOVERY

The Government respectfully submits this Memorandum of Law in response to the Motions filed on December 17, 2011 by defendants Issa, Touré, and Abdelrahman.

Each of the defendants has made a motion to dismiss the Indictment and to suppress post-arrest statements. Defendant Abdelrahman has moved to dismiss the Indictment on the grounds that 1) Congress did not intend to confer extraterritorial jurisdiction over the charged offenses; 2) if Congress intended to confer jurisdiction over the charged offenses, it exceeded its legislative authority in doing so, and 3) if Congress lawfully could confer jurisdiction over the charged offenses and intended to do so, the charged offenses nonetheless lack sufficient nexus to the United States and its interests such that jurisdiction in this Court would violate the Due Process clause of the Fifth Amendment of the U.S. Constitution. Defendants Issa and Touré also move to dismiss the Indictment, echoing the third ground

1

supporting Abdelrahman's motion to dismiss: that the charged offenses lack sufficient nexus to the United States and its interests such that jurisdiction in this Court would violate the Due Process clause of the Fifth Amendment of the U.S. Constitution.

Each of the defendants also moves to suppress post-arrest statements made to DEA agents after their arrest and during their transit from Ghana to the United States, on the grounds that either <u>Miranda</u> warnings were not read to them, or that <u>Miranda</u> warnings were given but were not understood or properly waived.

Lastly, Abdelrahman moves the Court for an order compelling the Government to procure the presence of defense witnesses at trial or, in the alternative, to provide for Rule 15 depositions for those witnesses prior to trial.

For the reasons set forth below, defendants' motions to dismiss are meritless, and should be denied. Because defendants' motions to suppress raise factual issues necessitating a hearing, including the factual question of whether <u>Miranda</u> warnings were issued to them, the Government consents to a hearing on the defendant's suppression motions. Abdelrahman's motion to compel the Government to assist in procuring the presence of witnesses at trial should, on the current record, be denied as unripe.

Trial of the defendants is scheduled to commence May 2, 2011.

# I.  Background

The defendants are named in a two-count indictment (the "Indictment") returned on December 30, 2009, which charges each of them in two counts: Count One charges a narco-terrorism conspiracy, in violation of Title 21, United States Code, Section 960a, and Count Two alleges a conspiracy with two objects: 1) to provide material support and resources to the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"), and 2) to provide material support and resources to al Qaeda and al Qaeda in the Islamic Maghreb ("AQIM") in violation of Title 18, United States Code, Section 2339B.  Venue in the Southern District of New York is pursuant to Title 18, United States Code, Section 3238.

As detailed in the Criminal Complaint ("Cmplt.") and Indictment ("Ind."), each of the FARC, al Qaeda, and AQIM is and has been designated a foreign terrorist organization by the U.S. Department of State, and has directed its terrorist activities to the United States and its interests.  For purposes of brevity, the allegations regarding the activities and pronouncements of the FARC, al Qaeda and AQIM against the U.S. are not repeated herein, but rather incorporated by reference.

## A.   The Investigation

The instant prosecution arises from an investigation conducted by agents of the U.S. Drug Enforcement Administration ("DEA") that began in the Summer of 2009.  As part of the

investigation, in August of 2009, a confidential source working for the DEA ("CS-1"), posing as a Lebanese radical committed to opposing the interests of the United States, arranged a meeting with Defendant Issa, who had been identified to CS-1 as a facilitator for a criminal organization operating within the West African countries of Togo, Ghana, Burkina Faso and Mali.

On September 14, 2009, CS-1 met Issa in Ghana. During the meeting, CS-1 told Issa that he represented members of the FARC, and explained to Issa that the FARC was very sympathetic to "the cause" and held anti-American views similar to those of Issa and to the views ostensibly held by CS-1 in his cover identity as a Lebanese radical. CS-1 explained that the FARC wanted to transport cocaine from West Africa, through North Africa, and into Spain, and asked Issa if he was capable of providing secure passage of cocaine on that transportation route. CS-1 told Issa that working with the FARC would generate money for their shared causes. See Cmplt. ¶¶11(a)-(b).

Issa explained that associates of his in Mali were capable of ensuring safe passage through the desert and confirmed that the protection would come from armed members of Al Qaeda. CS-1 and Issa agreed that the two of them, joined by a third individual identified by Issa as a leader in his facilitation network, would meet in Ghana soon to further discuss the details of the transaction. See Cmplt. ¶¶11(c)-(d).

On October 6, 2009, CS-1 had a series of meetings with

-4-

Issa and an individual subsequently identified as the defendant

Touré in Accra, Ghana, to continue discussions regarding the

proposed transport of cocaine through Africa. Touré was

introduced at the meeting as Issa's boss, and described that he

leads a criminal organization that works with groups in North

Africa with affiliations to al Qaeda. CS-1 explained that he was

meeting with Touré on behalf of the FARC, which CS-1 named

explicitly, and described the organization as being sympathetic

to their (CS-1's and Touré's) mutual cause. CS-1 explained that

the FARC needed assistance with the transportation of cocaine

from Ghana to the sea of Spain. CS-1 told Touré that the FARC

worked with other Islamists that oppose American interests. See

Cmplt. ¶13(a).

Touré explained that his group controls the desert and

advised that the route from Ghana to Mali was generally safe, but

that the transportation of the cocaine from Mali across the

desert to Morocco would be facilitated by al Qaeda groups in 4x4

vehicles. Touré described his strong relationship with the al

Qaeda groups that control areas of North Africa, stating that he

has worked with al Qaeda to transport and deliver between one and

two tons of hashish to Tunisia and that his organization and al

Qaeda have collaborated in the human smuggling of Bangladeshi,

Pakistani and Indian subjects into Spain. Touré also explained

that he supports al Qaeda with gasoline and food and collects

taxes from many rich Malian people throughout the region on al

Qaeda's behalf.  Touré stated that he understands the Colombians' hatred for the Americans.  See Cmplt. ¶13(b).

Touré negotiated a transportation cost of $2,000 per kilogram of cocaine, which included payment to his al Qaeda contacts for the transport and security of the cocaine through North Africa, across the desert, to the coast of Morocco.  Touré informed CS-1 that once the load was turned over to al Qaeda, they would not allow an outsider to follow them through North Africa.  In a series of subsequent telephone calls, Touré agreed at the next meeting to bring a representative of the group that would be responsible for the security of the cocaine during transit. CS-1 and Touré then exchanged a series of e-mails, in which CS-1 promised to bring a representative of the FARC and Touré responded that he had made all the necessary contacts with his "Muslim brothers" in advance of the transaction.  See Cmplt. ¶¶14(a)-(d).

On November 17 and 18, 2009, CS-1 and an additional DEA confidential source posing as a member of the FARC ("CS-2") met with Touré and the defendant Abdelrahman in Ghana.  At the outset of the meeting, CS-2 introduced himself as a high-ranking member of his organization interested in shipping a series of 500 to 1,000 kilogram loads of cocaine across Africa to Europe.  CS-2 explained that he and his group had been fighting a war against the Americans, Colombians, and many other governments for a very long time.  CS-2 further explained that to finance this war, his

organization generated money from the sale of cocaine.
Abdelrahman was introduced as a leader of a "militia" of 11 armed
men and told CS-1, in substance, that he was "wanted by the
world" because of his status as a "General" in the militia, and
that because of his status he could not travel in Europe. Touré
and Abdelrahman identified themselves as the "kings" of the
desert and described themselves as "warriors of god and fighting
for god." CS-1 explained to Abdelrahman in substance that CS-2
hates Americans and that Americans killed CS-2's brother.
Abdelrahman responded by pointing to CS-2 and saying, in
substance, that if this was the case, that CS-2 was now
Abdelrahman's brother. CS-1 then told Touré and Abdelrahman that
CS-2 is glad to be working with Touré and Abdelrahman because
they all hate Americans and are committed to the same cause.
Abdelrahman then responded "god willing, god willing." See
Cmplt. ¶15(a).

        During the meetings, Touré and Abdelrahman said that
they have the ability to safely transport cocaine shipments for
CS-2 and his group. Abdelrahman said that Touré handles the
business aspects of the operation and possesses useful political
contacts in Mali, while Abdelrahman's role is to provide weapons
and to use his status in the "militia" to ensure safe passage of
merchandise through the desert, adding that Abdelrahman's people
possess the force, the weapons, and the vehicles to do so. Touré
explained that he would use a truck to transport the cocaine from

Ghana to Mali or Niger.  At that point Touré would combine
efforts with Abdelrahman and his group to transport the cocaine
through the desert to the coast of Morocco, through the small
Moroccan coastal town of Aghadir, and then via a route that
passes through a river out to the Canary Islands.  Touré and
Abdelrahman said that they would charge 3,000 Euros per kilogram
that they transport and would request a 10% down payment prior to
each transport.  According to Touré and Abdelrahman, this money
was needed to cover various expenses, including vehicles, gas,
water, and payments to people working with their organization,
among other things.  Touré and Abdelrahman said that the profits
of the work will go to their people to support the fight for "the
cause."  See Cmplt. ¶15(a)-(b).

        During a meeting in Ghana that took place on or
about November 18, 2009, CS-1 and CS-2 told Touré and Abdelrahman
that CS-2 spoke to other leadership members of the FARC and that
they decided that they wanted Touré and Abdelrahman to purchase
the truck that will be used to transport the cocaine shipments
from Ghana to Abdelrahman's group in the desert, and handed
$25,000 to Touré and Abdelrahman.  Touré advised that he would
purchase the truck for the operation.  During the discussions
about the truck and the transportation operation, CS-1 and CS-2
explained to Touré and Abdelrahman that the cocaine would be
concealed in construction material and would be undetectable
until it is processed at a lab located in Europe.  See Cmplt.

¶16.

Following the meetings on November 17, 2009 and
November 18, 2009, CS-1 and CS-2 spoke to Touré and Abdelrahman
to further plan and coordinate the proposed narcotics trafficking
activity. After a series of calls, on or about November 30,
2009, CS-1 spoke with Abdelrahman and Touré by phone. During
this call, Abdelrahman and Touré indicated that they were ready,
that they had purchased the vehicle, and that they were waiting
for further direction. On or about December 3, 2009, Touré told
CS-1 that he had purchased a truck, which he described as a
Mercedes six-wheeler, and that the truck was already in Ghana.
See Cmplt. ¶¶17(e)-(f).

On or about December 13, 2009, CS-1 and CS-2 met with
Touré and Abdelrahman, the defendants, in two separate meetings
in Ghana. Touré and Abdelrahman explained that the truck they
had purchased for the transport of the cocaine was being
outfitted with higher sides in order to better conceal the load
of cocaine, and gave a set of keys to the truck to CS-1 and
showed CS-1 and CS-2 a picture of the truck taken on Touré's
cellular phone. After a series of discussions on December 13
about the payment of transportation costs, the next day, December
14, 2009, CS-1 and CS-2 met with Touré and Abdelrahman in Ghana.
CS-1 told Abdelrahman and Touré that CS-2 had been on the
telephone the entire night explaining the negotiations to his
bosses, and that CS-2 and his organization (referring to the

FARC) had agreed to pay the money that Abdelrahman and Touré had requested. Touré then explained that he had been upset about their discussions the previous day because he and Abdelrahman had made substantial preparations for the cocaine transport on the understanding that an agreement had been reached and the plan was moving forward. Touré explained, in substance, that he had traveled to the frontier of Morocco, that he had purchased the off-road vehicles that would be used to transport the cocaine in the Sahara, and that he had prepared people all along the transportation route to assist them, including in Niger. Touré continued that he had also brought a friend who was a chauffeur that drives trucks for "our people, Al Qaeda" through the desert. Later in the meeting, CS-1 began to speak with Abdelrahman in Arabic, and told him that CS-2 is from "the FARC" and that CS-2's thinking is "military" like Abdelrahman's thinking. CS-1 elaborated that CS-2 and Abdelrahman have the same cause, stating that both Abdelrahman's group and CS-2's group are "against Americans," to which Abdelrahman nodded his head in assent. Touré continued to explain that he had already begun to pay for the people and protection necessary to accomplish the cocaine transportation venture with CS-1 and CS-2 and had brought another member of Al Qaeda with him to Accra who could help Abdelrahman transport the cocaine along the route. Touré explained that Abdelrahman and the other Al Qaeda members would be able to navigate through the region and they together had already

established a route and a cover story to deal with complications and questions along the route. Touré went on to explain that their group provides protection for airplanes that land in their area, including incoming planes from Colombia. <u>See</u> Cmplt. ¶¶18, 19(a)-(b).

CS-1 stated that CS-1 would be able to meet with Touré and Abdelrahman tomorrow to make the final payment for the truck and take possession of it. Touré said that they had secured a location where they could remove the cocaine from the truck and then place an additional cover load on the cocaine with help from people from their group located in Ghana. Touré stated that he would place bananas or oranges on the load as additional "camouflage". Touré explained that he had prepared the "military people" that would be assisting them. Touré clarified that the "military people" were "Al Qaeda." Lastly, CS-1 again spoke with Abdelrahman in Arabic and, intertwining the fingers of his two hands, said that his group and Abdelrahman's group "would be like this – the two organizations together." Abdelrahman made the same gesture with his hands and affirmed that the two organizations are coming together. Abdelrahman then brought his fist and hand together and said "god willing." <u>See</u> Cmplt. ¶¶19(c)-(d).

B.   <u>The Defendants' Arrests and Expulsion</u>

On December 16, 2009, Touré and Abdelrahman were arrested by members of the Ghana Narcotics Control Board (NCB) in

a hotel room in Accra, Ghana, along with Mohammad Touré, the nephew of defendant Harouna Touré.  Issa was arrested later by the NCB at a different hotel in Accra.  All four men were brought to NCB headquarters, where they were processed and physical evidence seized from them was inventoried.  They were interviewed by NCB agents in French while a DEA agent was present; that DEA agent does not speak French, but received summary interpretation in English from NCB personnel.  After the men were detained by Ghanaian authorities overnight, the Ghanaian authorities transferred custody of the defendants, who are not Ghanaian citizens, to the custody of the United States.  The defendants were placed on a DEA plane and flown to the White Plains airport.

While the defendants were en route from Accra to White Plains, each of them was Mirandized in French by DEA Special Agent Bronwyn Haley, who translated the warnings printed on a DEA Miranda form from English to French.  See Affidavit of DEA Special Agent Bronwyn Haley ("Haley Aff.") ¶¶ 6-8.  Special Agent Haley is fluent in French, and for the five years preceding her involvement in this investigation, was the DEA Assistant Country Attaché, stationed in Paris, France.  Haley Aff. ¶ 5.  Her duties in that capacity included oversight of DEA operations and counterpart relationships in the Maghreb and North and West African regions, where she frequently traveled.  Haley Aff. ¶ 5.  During the five years that she was posted in Paris, Special Agent Haley worked almost exclusively in the French language.  Haley

Aff. ¶ 5.   After being read the warnings by Special Agent Haley,
each of the defendants indicated that he understood the <u>Miranda</u>
warnings, orally waived them, and made a lengthy statement in
French: Issa was debriefed for over two hours; Abdelrahman for
approximately 30 minutes, and Touré for over two hours.   Haley
Aff. ¶¶ 6-8.   Special Agent Haley did not observe any of the
defendants to have any difficulty communicating in French or any
difficulty understanding her.   Haley Aff. ¶¶ 6-8.

## II. The Motions To Dismiss
## The Indictment Should Be Denied

The defendants make three arguments in support of their
motions to dismiss: (1) That Congress did not intend the charged
statutes to reach the defendants' alleged acts; (2) that Congress
lacks legislative authority to criminalize the defendants'
alleged acts even if it intended the charged statutes to reach
those acts, and (3) that the defendants' alleged acts lack
sufficient nexus to the United States such that jurisdiction in
this Court would violate the Due Process clause of the Fifth
Amendment of the U.S. Constitution.   For the reasons set forth
below, defendants' motions to dismiss are meritless and should be
denied.

### A.   The Government Has Properly Alleged
### Violations Of Both The Material Support
### And Narco-Terrorism Statutes

The heading describing the first ground in support of
Abdelrahman's motion to dismiss, which has been joined by the

other defendants, reads "The Indictment Must be Dismissed Because It Fails to Describe Any Conduct That Congress Intended to Be a Crime under the Jurisdiction of the Laws of the United States." The arguments supporting this ground for dismissal are familiar arguments commonly raised in prosecutions following extraterritorial investigations, and are commonly and readily rejected, as they should be here.

While many of those arguments exceed the permissible scope of inquiry on this motion, they are nonetheless addressed, at least briefly, below.  The Government's responses to those impermissible arguments, however, should not obscure the elementary reasons why the motions, if properly delimited and viewed through the applicable standards, are patently meritless and should be denied:

1) The indictment properly alleges each of the elements of each of the statutes contained therein, including the jurisdictional elements;

2) Each of the statutes represents a legitimate exercise of Congressional legislative authority, and

3) The Court's exercise of adjudicative subject matter jurisdiction over these defendants is entirely consistent with Due Process.

### 1. Each of the Charged Statutes Applies Extraterritorially

To the extent that any single argument predominates the first stated ground in support of Abdelrahman's motion to

dismiss, it is that none of the express jurisdictional bases in each of the charged statutes is satisfied here.  See Abdelrahman Mem. at 14-31.  As set forth below, that argument is both defective – because Abdelrahman attacks not whether jurisdiction is properly alleged, but rather whether it can be proven – and ultimately meritless.

Abdelrahman concedes that the Material Support and Narco-Terrorism statutes apply extraterritorially, but denies that they apply extraterritorially in this case. See Abdelrahman Mem. at 16 ("[b]oth the narco-terrorism and material support statutes, of course, contain provisions for extraterritorial application under some circumstances.") (emphasis in original). As Abdelrahman discusses in his brief, each of the statutes sets forth express statutory bases supporting jurisdiction over violations of the statute.  See Title 18, United States Code, Section 2339B(d); Title 21, United States Code, Section 960a(b).

Abdelrahman argues, based on his own accounting of the operative facts of the case, that the only plausible statutory basis for jurisdiction involves the defendants being brought to or found in the United States.  See Abdelrahman Mem. at 17 ("The Government Can Only Arguably Rely on Mr. Abdelrahman's Presence Before the Court as a Jurisdictional Basis under Either Statute").  He then argues that this basis for jurisdiction is nullified by the manner in which the defendants were brought to the United States. See Abdelrahman Mem. at 21-31.

> 2. Multiple Statutory Bases for Jurisdiction are
> Properly Alleged as to Each Count of the
> Indictment

Abdelrahman's analysis, however, as it evaluates and rejects whether factual support exists for the <u>possible</u> bases for jurisdiction, fails to acknowledge the <u>alleged</u> bases for jurisdiction, and fails to acknowledge that at this stage of the proceedings, a proper allegation is all that is required. <u>See</u> <u>United States v. Alfonso</u>, 143 F.3d 772, 776 (2d Cir. 2003) (indictment "need do little more than to track the language of the statute charged and state the time and place of the alleged crime."). The Government's allegations plainly suffice: In each count of the Indictment, the Government has alleged, first, that the defendants participated "in an offense occurring in and affecting interstate and foreign commerce" and second, that the defendants "were first brought to and arrested in the Southern District of New York." <u>See</u> Indictment ("Ind.") ¶8 (Narco-Terrorism); Ind. ¶13 (Material Support). Each of these allegations – that the offense affected interstate and foreign commerce and that the defendants were first brought to the Southern District of New York – tracks an express basis for jurisdiction set forth in each of the statutes the defendants are alleged to have violated. <u>See</u> Title 21, United States Code, Section 960a(b)(2) & (b)(5); Title 18, United States Code, Section 2339B(d)(C) & (d)(E).

Accordingly, the Indictment properly alleges not one, but two statutory bases supporting jurisdiction for each count. Abdelrahman's motion, which focuses not on whether any jurisdictional basis is properly alleged, but rather whether the facts – as he conceives them – are sufficient to satisfy any of the statutory jurisdictional bases, is beyond the permissible scope of argument on a motion to dismiss, and should be rejected.

       3.    Abdelrahman's Allegations Of Rendition And
              Other Violations Of International And
              Ghanaian Law Are Baseless And Irrelevant

As a further – and similarly improper – attack on the factual propriety of jurisdiction, Abdelrahman attacks at length the manner in which the defendants were arrested and brought to the United States. <u>See</u> Abdelrahman Mem. at 21-31.  That attack is irrelevant.  Even assuming <u>arguendo</u> that the defendants were brought to the U.S. in violation of various laws and conventions under circumstances amounting to a forcible kidnaping (they were not), defendants' motion to dismiss would fail on this ground as a matter of law.

As an overarching matter, it is well established that "the manner in which an indicted individual comes before a court does not affect the court's jurisdiction." <u>United States</u> v. <u>Awadallah</u>, 202 F.Supp.2d 17, 41 (S.D.N.Y. 2002); <u>see</u> <u>also</u> <u>United States</u> v. <u>Al-Kassar</u>, 582 F.Supp.2d 488, 495 (S.D.N.Y. 2008) (citing <u>Frisbie</u> v. <u>Collins</u>, 342 U.S. 519, 522 (1952) and <u>Ker</u> v. <u>Illinois</u>, 119 U.S. 436, 444 (1888)).  While this overarching

principle alone moots all of Abdelrahman's arguments regarding
violations of international law, international treaty, and
Ghanaian law in the manner in which the defendants were brought
before this Court, those arguments can also be specifically and
additionally rejected on separate grounds.[1]

First, to the extent it is alleged that Ghanaian
authorities did not comply with Ghanaian law in connection with
the transfer of the defendants, the U.S. Government is not
responsible for ensuring such compliance.  See, e.g., United
States v. Lira, 515 F.2d 68, 72 (2d Cir. 1975) ("The United
States Government did not owe appellant any obligation to enforce
his asserted right under Chilean law); United States v. Salinas
Doria, No. 01 Cr. 21 (GEL), 2008 WL 4684229, at *4 (S.D.N.Y. Oct.
21, 2008) ("[C]harges against a defendant in an American court
should not be dismissed solely because of an alleged defect in
the judicial or diplomatic processes leading to that defendant's
extradition.").

Second, Abdelrahman's arguments regarding consular
notification and other treaty violations are similarly unavailing
because neither the Vienna Convention on Consular Relations nor
any of the other treaties cited by Abelrahman creates judicially

---

[1]     To the extent that Abdelrahman argues that the "found in"
jursidictional basis set forth in each statute cannot be met in
this case, that is a question for trial, and not appropriately
raised here.  In any case, in United States v. Yousef, 327 F.3d
56 at 88-90 (2d Cir. 2003), the Circuit examined similar "found
in" language and determined that establishing that the defendant
was "found in" the U.S. for jurisdictional purposes did not
depend on the defendant being present in the U.S. voluntarily.

enforceable individual rights, and if they did create such rights, dismissal of the indictment would not be the appropriate remedy.[2] See United States v. De La Pava, 268 F.3d 157 (2d Cir. 2001); Sanchez-Llamas v. Oregon, 548 U.S. 331, 350 (2006); United States v. Gomez, 644 F.Supp.2d 362, 372 (S.D.N.Y. 2009).

Notwithstanding the foregoing, the defendants' expulsion from Ghana occurred with the knowledge and consent of the Ghana Narcotics Control Board, whose agents lawfully transferred custody of the defendants to the DEA. Consequently, in addition to being legally erroneous, Abdelrahman's arguments in this regard are factually erroneous.

---

[2] At various points in the motion, Abdelrahman invokes international law in support of his reading of the statutes at issue, see Abdelrahman Mem. at 15-17; 21-31, primarily in service of the circular argument that jurisdiction in this case would violate international law, and that because a canon of construction provides that no statute should be construed to violate international law, the statutes at issue should not be construed to provide for jurisdiction. This argument is entirely erroneous.

It is well established that Congress may confer extraterritorial jurisdiction even if it would violate international law, and equally clear that courts are bound to effectuate that congressional intent to the limits of Due Process. See Yousef, 327 F.3d at 86, 109 (2d Cir. 2003)("If [Congress] chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law").

Congress clearly intended to confer jurisdiction here to the limits of Due Process, without regard to any limitation articulated by international law. In the legislative history of the Material Support statute, Congress explicitly stated that

"[t]he purpose of this subtitle is to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities."

Pub. L. 104-132 Sec. 301(a)(emphasis added).

B.  The Charged Statutes Represent An
    Appropriate Exercise Of Congressional
    Legislative Authority

"Every law enacted by Congress must be based on one or
more of its powers enumerated in the Constitution." United
States v. Morrison, 529 U.S. 598, 607 (2000) (citing Marbury v.
Madison, 1 Cranch 137, 176, (1803)).  Abdelrahman himself
acknowledges that in enacting the Narco-Terrorism statute,
Congress explicitly grounded its legislative authority in the
Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, and the Offenses
Clause, U.S. Const. Art. I, § 8, cl. 10.  See Abdelrahman Mem. at
32-33.  Abdelrahman further acknowledges that in passing the
Material Support statute Congress explicitly invoked its power
under the Offenses Clause and its power to enact laws to enable
the U.S. to carry out its treaty obligations under the "necessary
and proper" clause,  U.S. Const. Art. I, § 8, cl. 18.  See id. at
33.  Although not referenced by Abdelrahman in his brief, as set
forth below, Congress also explicitly invoked its Commerce Clause
authority in enacting the Material Support statute.

Abdelrahman does not argue that the statutes are
overbroad, or vague, such that it is unclear whether the elements
of the statute are met by his acts, or that he lacked notice that
his acts could be criminal, nor does he argue that the statutes
charged, or certain provisions of those statutes, fall outside
Congress's commerce power entirely.  Rather, Abdelrahman makes
the narrow argument, primarily because of the geographic

-20-

attenuation of their actions from the territory of the U.S.,
that application of the statutes to the defendants and their
conduct would exceed Congressional authority under the Commerce,
Offenses, and Necessary and Proper clauses of the Constitution.
As set forth below, the challenged statutes embody a valid
exercise of multiple enumerated Constitutional sources of
Congressional authority, and the type of argument made by
Abdelrahman – that the statutes are not invalid but that the
defendants' conduct is so attenuated from the sources of
Congressional authority that they cannot be reached – is legally
meritless.

1.    The Narco-Terrorism Statute Is A Valid
       Exercise of Commerce Clause Authority

Turning first to Abdelrahman's as-applied challenge to
the Narco-Terrorism statute, it is beyond serious argument that
Congress has authority under the Commerce Clause to regulate the
distribution and sale of controlled substances – a
quintessentially economic activity – and that Congressional
authority under the Commerce Clause includes the authority to
criminalize illegal narcotics trafficking.  See Gonzalez v.
Raich, 545 U.S. 1 (2005); see generally United States v. Lopez,
514 U.S. 549, 558 (1995).  In fact, Congress has enacted a
comprehensive civil regulatory and criminal statutory scheme
governing the production, sale and distribution of controlled
substances: the Narco-Terrorism statute is part of the Controlled
Substance Import and Export Act, codified at Title 21, United

States Code, Section 951, et seq., which is itself a part of a much broader regulatory framework set forth in the Controlled Substances Act, 21 U.S.C. 801, et seq.

Given this broad regulatory backdrop, Abdelrahman's as-applied challenge can only properly be viewed as a request to excise an individual application from a concededly valid comprehensive statutory scheme: Abdelrahman argues that application of the Narco-Terrorism statute to his conduct would criminalize a transaction he characterizes as entirely foreign – rather than an argument that the statute as a whole, or one of its provisions, exceeds legislative authority. Such a challenge fails ab initio. See Perez v. United States, 402 U.S., 151, 154 (1971) ("[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class.") (quoting Maryland v. Wirtz, 392 U.S. 183, 193 (1968)).

In this case, the class of activities regulated by the Narco-Terrorism statute – narcotics trafficking – is clearly within the reach of federal power. Whatever argument may be made by the defendants regarding the de minimis impact that the transaction at issue in this case had on foreign or interstate commerce, or the fact that the statute as applied would touch on a purely foreign transaction,[3] is entirely irrelevant to the

---

[3]    Abdelrahman relies primarily on the geographic attenuation of the defendants' acts from the U.S. to bolster his as-applied constitutional challenges.  That reliance, however, is misplaced

-22-

analysis:  "When a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." Lopez, 514 U.S. at 558(internal citations and quotations omitted); see Raich, 545 U.S. at 22 ("[t]hat the regulation ensnares some purely intrastate activity is of no moment ... we refuse to excise individual components of that larger scheme.").

> 2.   The Material Support Statute Is A Valid Exercise of Congress's Commerce and Treaty Authorities

In Lopez, the Court made clear that "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce."  514 U.S. at 558 (internal citations omitted).  The Court went on to outline four factors to be considered when determining whether a regulated activity has a "substantial affect" on interstate commerce:  (1) whether the activity is inherently economic in nature; (2) whether the statute in question contains a specific jurisdictional nexus; (3) whether there are Congressional findings of an economic link between the activity in question and interstate commerce; and (4) how attenuated the link is between the regulated activity and interstate commerce.  Id. at 559-67.

---

in this context and is more appropriately argued in the Due Process context, where, as set forth more fully below, it nonetheless fails.

Congress explicitly found in enacting the Material Support statute that "international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States."  Pub. L. 104-132 Sec. 301(a)(4).

The Indictment charges that one of the terrorist organizations to which the defendants rendered material support and resources was al Qaeda.  It is, again, beyond serious argument that the terrorist activities of al Qaeda have had a profound impact on the foreign commerce of the U.S., including, as cited by Congress, on the international travel of United States citizens.  Of course, the inquiry to be conducted by a District Court in this context is not whether supporting international terrorist organizations in fact substantially impacts commerce, but only whether a rational basis existed for Congress so to conclude when the statue was enacted.  See Raich, 545 U.S. at 22.

Congress clearly had a rational basis to conclude that the provision of support and resources to designated foreign terrorist organizations, including al Qaeda, particularly given al Qaeda's repeated tactic of blowing up, and attempting to blow up, airplanes carrying Americans and foreign locations where Americans are found, would impact foreign commerce – as it explicitly stated and found in the legislative history of the

statute.  Congress was therefore acting well within its authority
under the Commerce Clause in enacting the statute.  Again, as
with defendants' challenge to the Narco-Terrorism statute, any
suggestion that the particular alleged conduct in this case –
which includes an allegation that al Qaeda would benefit
financially from the transaction – is too remote from foreign
commerce to ground the statute in Constitutional authority is not
only factually unpersuasive, given the profound and lasting
impact al Qaeda's activities have had on U.S. interstate and
foreign commerce, but also legally irrelevant under <u>Raich</u> and
<u>Lopez</u> as an attempt to excise an individual application from a
valid statutory scheme.

  The Material Support statute also reflects a valid
exercise of Congress's authority to make all laws necessary and
proper to comply with its obligations under international
treaties and to carry out the Treaty Power, U.S. Const. art II,
§2, cl. 2.  In the findings accompanying the statute, Congress
wrote

> [T]he Constitution confers upon Congress the power
> to punish crimes against the law of nations and to
> carry out the treaty obligations of the United States,
> and therefore Congress may by law impose penalties
> relating to the provision of material support to
> foreign organizations engaged in terrorist activity;
>
> [I]nternational cooperation is required for an
> effective response to terrorism, as demonstrated by the
> numerous multilateral conventions in force providing
> universal prosecutive jurisdiction over persons
> involved in a variety of terrorist acts, including
> hostage taking, murder of an internationally protected
> person, and aircraft piracy and sabotage

Pub. L. 104-132 Sec. 301(a)(4)-(5).

In Title 18, United States Code, Section 2339C, Congress expressly identified no fewer than eight international treaties bearing on the subject matter of international terrorism, see 18 U.S.C. 2339C(e)(7), all of which the Material Support statute, 18 U.S.C. 2339B, reasonably implements by prohibiting the provision of support and resources to designated terrorist organizations.  See generally United States v. Yian, 905 F.Supp. 160, 164-165 (S.D.N.Y. 1995) (applying rational basis review to enactment of hostage taking act pursuant to Treaty power).[4]

> C.    The Court's Exercise Of Subject Matter
>        Jurisdiction Over The Defendants
>        Does Not Violate Due Process

It was specifically contemplated and openly discussed that the defendants' actions would benefit two terrorist organizations that have targeted the U.S. and its interests.  One of those terrorist organizations, al Qaeda, has as its primary characteristic and its defining purpose its commitment to attack the United States, its allies, and its interests, and to kill Americans anywhere in the world the opportunity presents itself. Throughout the course of the negotiations, the defendants and the DEA confidential sources openly discussed their hatred for the

---

[4]    While the Government believes that each of the statutes also represents a valid exercise of Offenses Clause authority, it does not address that possible source of legislative authority herein because the statutes are valid as necessary and proper enactments pursuant to the Commerce and Treaty authorities.

U.S., and explicitly discussed that the money would finance "war" against America. In light of the explicitly contemplated consequences of the defendants' alleged actions, those actions have more than a sufficient nexus to the U.S. and its interests to satisfy Due Process. Defendants's arguments to the contrary are meritless and should be rejected.

1. Defendants' Motions

Abdelrahman argues that because the proposed narcotics transaction involved West Africa and Europe, because its instrumentalities (a Mercedes truck, a Malian passport, payment in Euros) were foreign, because no English was spoken, and because none of the participants had ever been to the U.S., the defendants could not have anticipated being tried for their crimes in the United States, and that therefore jurisdiction here is so fundamentally unfair that it violates Due Process. See Abdelrahman Mem. at 41-42. Notably, Abdelrahman grounds his argument purely in terms of his own expectation, and not in terms of actual nexus to the U.S.: he makes no mention of al Qaeda, AQIM or the FARC in his recitation of the facts relevant to this point, and even asserts that "[n]ot a single word was spoken about attacking American targets or bringing drugs to the U.S. market," an assertion that parses too finely the alleged facts.

Issa argues similarly that because he is not a U.S. citizen or resident, his conduct took place abroad, and he could not have expected his actions to produce any effect in the U.S.,

jurisdiction would violate Due Process.  Unlike Abdelrahman,
however, Issa acknowledges the allegation that al Qaeda would
benefit financially from the proposed drug transaction.  See
Memorandum of Law of Oumar Issa dated December 17, 2010 ("Issa
Mem.") at 8-12.  Touré makes arguments substantially similar to
those made by Issa.  See Memorandum of Law of Harouna Touré dated
December 17, 2010 ("Touré Mem.").

As set forth below, defendants' arguments to the
contrary notwithstanding, there is a clear and evident nexus
between their conduct and the U.S. and its interests such that
jurisdiction is consistent with Due Process.

2.    Applicable Law

Congress's power to confer extraterritorial
jurisdiction is circumscribed by the limits of Due Process.  The
Second Circuit has held that "in order to apply
extraterritorially a federal criminal statute to a defendant
consistently with Due Process, there must be a sufficient nexus
between the defendant and the United States, so that such
application would not be arbitrary or fundamentally unfair."
Yousef, 327 F.3d 56, 111 (2d Cir. 2003) (quoting United States v.
Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)); United States v. Al
Kassar, 582 F.Supp.2d 488, 494 (S.D.N.Y. 2008).  While courts
often refer to principles of international law in assessing the
question of nexus, and primarily in assessing the expectations of
criminal defendants, "[t]he ultimate question is whether

defendant's conduct is not 'so unrelated to American interests as to render their [being sued] in the United States arbitrary or fundamentally unfair.'" Goldberg v. UBS AG, 690 F. Supp. 2d 92, 106, 108-111 (E.D.N.Y. 2010)(setting forth and defining the five recognized principles of international law under which extraterritorial jurisdiction may be appropriate) (quoting Yousef, 327 F.3d at 112).

Courts have found sufficient nexus in a variety of factual circumstances. In Yousef, the Second Circuit held that the defendants' acts had a sufficient nexus to the United States where they "conspired to attack a dozen United States-flag aircraft in an effort to inflict injury on this country and its people and influence American foreign policy." Yousef, 327 F.3d at 112. In Al Kassar, the Court held that the defendants' acts had a sufficient nexus to the United States where they conspired "to sell weapons to the FARC in an effort to inflict injury on the United States and its people" in Colombia. Al Kassar, 582 F. Supp. 2d at 494. Most recently, in United States v. Jamal Yousef, 2010 WL 3377499 (S.D.N.Y. Aug. 23, 2010), Judge Keenan denied a Due Process challenge to a prosecution of an alleged weapons trafficker who believed that he was contracting to sell weapons to the FARC in Honduras in exchange for a large shipment of cocaine where, during the negotiations leading to the transaction, co-conspirators of the defendant claimed that the weapons were stolen from American forces in Iraq, and the DEA

sources posing as FARC operatives represented that the FARC distributed cocaine in the United States.

Notably, the Due Process Clause has almost never been held to bar a criminal prosecution in an American court. <u>See</u>, <u>e.g.</u>, <u>Jamal Yousef</u>, 2010 WL 3377499, at *3 n.1 ("The Court is not aware of any case in which a federal court has dismissed an action on the ground that the extraterritorial application of a federal statue violates the Due Process Clause."); <u>United States</u> v. <u>Ruemayr</u>, 530 F. Supp. 2d 1210, 1223 (D.N.M. 2008) ("[I]t appears that no federal court has invalidated the extraterritorial application of U.S. law on due process grounds."). Notwithstanding the statements in <u>Yousef</u> and <u>Reumayr</u> quoted above, there appears to be <u>one</u> case in which a court found that Due Process barred prosecution of a crime committed outside the United States. <u>See</u> <u>United States</u> v. <u>Perlaza</u>, 439 F.3d 1149, 1168-69 (9th Cir. 2006)(ordering dismissal where Government conceded on appeal that it had neglected to present any evidence of nexus below).

### 3. Analysis

Extraterritorial jurisdiction has been upheld as consistent with Due Process where the defendants' actions would harm U.S. citizens, often outside the United States, even where none of the acts of the co-conspirators ever touched on the territory of the United States. <u>See</u>, <u>e.g.</u>, <u>Yousef</u>, 327 F.3d 56, 111 (2d Cir. 2003) (plot to kill Americans abroad by destroying

commercial airliners in the Philippines); <u>Al Kassar</u>, 582
F.Supp.2d 488, 494 (S.D.N.Y. 2008) (plot to sell arms to the FARC
with knowledge that the FARC intended to use the weapons to kill
U.S. nationals in Colombia); <u>Jamal Yousef</u>, 2010 WL 3377499
(S.D.N.Y. Aug. 23, 2010) (plot to sell U.S. weapons stolen from
Iraq to the FARC, with knowledge that the FARC engaged in large-
scale cocaine trafficking to the U.S.).

In this case, the defendants had knowledge that the
contemplated narcotics transaction would help to finance the
terrorist activities of the FARC, a State-Department designated
foreign terrorist organization that has targeted American
interests, and al Qaeda, the organization responsible for the
September 11, 2001 attacks in the United States and numerous
other attacks intended to kill Americans elsewhere in the world,
including the American embassy bombings in Kenya and Tanzania in
1998. During the course of the negotiations, DEA confidential
sources explicitly informed the defendants that they represented
the FARC, and that the FARC sold cocaine to finance its "war"
with America. <u>See</u> Cmplt. ¶15(a). On numerous occasions, the
defendants themselves expressed that armed members of al Qaeda
would guard the shipment of narcotics, and would be paid for
their services. All of the participants expressed or
acknowledged the FARC and al Qaeda's shared hatred for Americans.

Given the foregoing, it was natural and foreseeable
that the defendants' actions, though committed entirely outside

the United States, would result in furthering the activities of the FARC and al Qaeda, and would as a result have effects detrimental to the U.S. and its citizens and interests, either within the U.S. or elsewhere, because it was entirely foreseeable that the FARC and particularly al Qaeda would use the gains of the transaction to fund efforts to attack America and its interests, as was explicitly discussed. That foreseeable result of the defendants' actions, which is entirely evident from the negotiations regarding the proposed narcotics transaction, is alone sufficient to establish the requisite nexus to satisfy Due Process. In <u>Jamal Yousef</u>, the Court wrote:

> CS-1 represented to Defendant's co-conspirators that the FARC relies on Mexican drug cartels to transport narcotics into the United States ... With such knowledge, it follows that in conspiring to provide weapons to the FARC, Defendant knew that arming an international drug-trafficking organization which smuggles narcotics across United States borders would have a considerable effect on United States interests.

2010 WL 3377499 at *5.

This case is no different: focusing specifically on the nexus between the defendants' support for al Qaeda and the U.S. and its interests, it was clear from the negotiations regarding the proposed narcotics transaction that al Qaeda would provide protection along the transport route, and would therefore need to be paid to provide such protection. It was furthermore openly discussed that al Qaeda is motivated by hatred for America. It follows that in agreeing to participate in the transaction with knowledge of the foregoing, and thereby agreeing to provide the

resultant financial benefit to al Qaeda, the defendants knew and understood that their actions would be supporting a terrorist organization whose animating purpose is to harm America's most paramount interests: the safety and security of its citizens, either in the U.S. or abroad. The nexus between the U.S. and its interests and the defendants' alleged acts is therefore self-explanatory, and is more than sufficient to satisfy the Due Process requirement that the Court's exercise of jurisdiction not be arbitrary or fundamentally unfair.

Defendants couch much of their argument in the absence of expectation regarding possible U.S. prosecution for their acts. While expectation is not the primary consideration in this context – nexus is – it cannot seriously be argued that individuals knowingly funding al Qaeda could not expect to be prosecuted in U.S. courts for their actions simply because those actions took place abroad; the U.S. has engaged in a decade-long world-wide manhunt for Osama Bin Laden – the FBI's most wanted fugitive – and is engaged in multiple military conflicts involving al Qaeda operatives around the world. Indeed, given al Qaeda's fundamental opposition to the U.S. and past history of attacks against the U.S., the U.S. is the most likely of any nation to seek to prosecute those that support it. Defendants' arguments that they could not have expected to be prosecuted in the United States for supporting al Qaeda are therefore meritless and unpersuasive.

## II.  The Motions To Suppress
## Defendants' Statements Should Be Denied

As set forth above and in the sworn affidavit of Special Agent Haley, the defendants were read <u>Miranda</u> warnings in French, indicated they understood them, and orally waived them. Each of them sufficiently understood Special Agent Haley – and Special Agent Haley understood them – that they could be debriefed extensively.  Under the circumstances, the defendants' contentions that they were not read and did not understand the warnings is facially implausible.  Nonetheless, each of the defendants has submitted an affidavit swearing as much.  Under the circumstances, the Government concedes that a material factual issue requiring a hearing has been raised, and will call witnesses and adduce testimony at that hearing establishing the knowing and voluntary waiver of <u>Miranda</u> rights by the defendants.

## III.  Abdelrahman's Motion To Compel
## The Government To Bring Defense Witnesses Into
## The Country For Trial Should Be Denied

Lastly, Abdelrahman moves the Court to compel the Government to assist in any way necessary to enable foreign witnesses to appear at trial, having moved the Court <u>ex</u> <u>parte</u> to issue subpoenas to compel the witness's presence at trial. Specifically, Abdelrahman requests that

> The Court direct the assistant United States attorneys assigned to this case to coordinate with the State Department to ensure that visas are available for the witnesses.  In the event that Mr. Touré requires permission from the Ghanaian authorities to travel to the United States, we request the government and the

> United States Attorney's Office aid in obtaining the
> Ghanaian officials' cooperation in authorizing Mr.
> Touré to travel to the United States so he can give his
> testimony before this Court.

Abdelrahman Mem. at 54.

Abdelrahman cites no support for this request, which would necessarily require the Department of Justice to direct the Department of State to take particular actions with respect to matters within the State Department's jurisdiction, a request that would be improper. Further complicating matters, the need for the witnesses' presence at trial was proffered to the Court ex parte, and the Government therefore has no basis for evaluating the merits of the request, and no knowledge or understanding of whether these witnesses are themselves affiliated with terrorist groups or otherwise involved in criminal activity such that their presence in the United States would present a danger. Even if it were inclined to render assistance to the defense in this regard, the Government on the current record has an insufficient basis to evaluate the request. As such, Abdelrahman's request for an order compelling the Government to act on behalf of his potential trial witnesses should be denied as either premature, or lacking sufficient support, or both.

Conclusion

For the reasons set forth above, the defendants'
motions to dismiss are meritless and should be denied;
defendants' motions to suppress, while they ultimately will be
shown to be meritless, necessitate a factual hearing, and
Abdelrahman's motion to compel the Government to bring
individuals into the country for trial should be denied.


Dated:    New York, New York
          February 18, 2011


                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney


            By:_____/s/_____
                Jeffrey A. Brown
                Christian Everdell
                Edward Y. Kim
                Assistant United States Attorneys
                (212) 637-1110/2556/2401