UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                           :

UNITED STATES OF AMERICA,

                           :       09 Cr. 1244 (BSJ)

     - v. -

                           :

HAROUNA TOURÉ,
IDRISS ABDELRAHMAN,         :

                 Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SENTENCING MEMORANDUM OF THE UNITED STATES**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              One St. Andrew's Plaza
                              New York, New York 10007

Christian R. Everdell
Edward Y. Kim
Assistant United States Attorneys
      -Of Counsel-

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of sentencing for Harouna Touré ("Touré") and Idriss Abdelrahman ("Abdelrahman") (collectively, the "defendants"), currently scheduled for October 30, 2012, and October 31, 2012, respectively. For the reasons set forth herein, the Government submits that the Guidelines calculation prepared by the Probation Department is correct, and that the terrorism enhancement is properly applied to both defendants. Although the resulting Guidelines range is 292 to 365 months' imprisonment, because the statutory maximum punishment for an offense under Title 18, United States Code, Section 2339B, is fifteen years, the sentence is capped at 180 months. As set forth below, the Government respectfully submits that a sentence of 180 months' imprisonment is both a reasonable and appropriate sentence in this case for both defendants.

## BACKGROUND

### A.     The Offense Conduct[1]

This investigation was initiated by the Drug Enforcement Administration ("DEA") with the assistance of a confidential source ("CS-1"). CS-1 provided the DEA with information about potential narco-terrorist activity in West Africa. CS-1 posed as an individual of Lebanese descent who worked for an organization of Colombian drug dealers. (PSR ¶ 13). In August of 2009, CS-1 identified an individual known as "Oumar," who was subsequently identified by the DEA as Oumar Issa, as a facilitator for a criminal organization operating within the West African countries of Togo, Ghana, Burkina Faso and Mali. CS-1 reported the information to the DEA and thereupon was instructed to arrange a meeting with Issa in Ghana, which CS-1 did, by telephone. (PSR ¶ 14).

---

[1] All citations to the Presentence Investigation Report ("PSR") in this section refer to the Offense Conduct section of the Touré PSR.

1. <u>September 14, 2009 Meeting</u>

On September 14, 2009, CS-1 and an individual named Hamada met Issa in Ghana. During the meeting, CS-1 told Issa that he worked with "Colombians from the FARC," which he described as "a militia" and "warriors."[2]  CS-1 explained to Issa that CS-1 and the FARC had "a common enemy . . . the Americans," and that they had "the same shared goal."  (PSR ¶¶ 15-16; GX 101-T at 5-6).  CS-1 further told Issa that the Americans were "after them" and that "[t]hey [the Americans] changed our country . . . . they mess us up all over the place."  (GX 101-T at 6).

CS-1 explained to Issa that the FARC needed assistance with transporting cocaine from West Africa, through North Africa, and into Spain.  To that end, CS-1 asked Issa if he was capable of providing secure passage for cocaine moving through North Africa.  (PSR ¶ 17).  CS-1 also indicated to Issa that the FARC wanted to work with "Qaeda" in the proposed drug deal and that the two organizations were "in the same cause."  (GX 101-T at 11-12).  Issa explained that he had associates in Mali, whom he described as "a network" of people with a "foothold . . . in the bush," who had weapons and who could "protect th[e] merchandise" as it passed through the desert.  (PSR ¶ 18).  In particular, Issa stated that he had a powerful contact in Mali, who had "means" and who knew "the network," and who had "people in Spain" and "people in Morocco."  Issa further told CS-1 that, in addition to drug trafficking, this man had helped "Hindus and Pakistanis" enter Spain via Morocco by providing them with fake passports.  CS-1 and Issa agreed that the two of them, joined by the individual referenced by Issa (who later turned out to be Harouna Touré), would meet in Ghana soon to further discuss the details of the transaction.  (PSR ¶ 19; GX 101-T at 21-27).  Before the meeting concluded, CS-1 indicated to Issa that he also wanted to purchase weapons in order to "kidnap people."  Issa responded, "in

---

[2] As described in the PSR, the FARC is a designated foreign terrorist organization based in Colombia that is dedicated to the violent overthrow of the government of Colombia.  The FARC has engaged in numerous acts of violence against the United States and its interests, including murders and kidnappings of U.S. nationals.

Mali there's nothing that's hard for us," and that it would not be "a problem." (PSR ¶ 18; GX 101-T at 14, 33-34).

On September 15 and 16, 2009, CS-1 made a series of consensually monitored telephone calls at the direction of DEA, during which CS-1 and Issa further discussed the cocaine transportation proposal previously discussed on September 14, 2009. Issa asked CS-1 for money to pay for his travel to Mali so that Issa could meet with the man referenced in the September 14, 2009 meeting and tell him about the business proposal with the Colombians. CS-1 asked for Issa's full name in order to send him money via Western Union. Issa provided his name, and the DEA arranged to have $300 sent to Issa in Togo to pay for Issa's travel to Mali. During a call on September 15, 2009, CS-1 reminded Issa that he needed weapons and indicated that they would be used for his "kidnapping job." Issa responded that it would be "no problem." (PSR ¶ 20).

2. October 6, 2009 Meetings

On October 6, 2009, CS-1 and Hamada had a series of recorded meetings with Issa and Touré, in Accra, Ghana, to continue discussions regarding the proposed transport of cocaine through Africa. Issa was present for some, but not all of the meetings. Touré was introduced at the meeting as Issa's boss. Touré indicated that he had agreed to meet with CS-1 to discuss Touré's ability to assist CS-1 and the Colombians with the transportation of cocaine from Ghana through North Africa to the coast of Spain. (PSR ¶ 21). During the meetings, CS-1 explained that he was meeting with Touré on behalf of a group of Colombians. CS-1 explained that the Colombians needed assistance with the transportation of cocaine from Ghana to Morocco and then on to Spain. (PSR ¶ 22). Touré stated that he had "done this work before" and would be able to transport the cocaine from Ghana through North Africa to Spain. (PSR ¶ 22; GX 109-T at 6). While demonstrating with a map and making notations thereon, Touré discussed the

various routes that he had used in the past to transport merchandise through the desert from Mali

to Morocco and other North African countries.  (PSR ¶ 22).  Touré explained that he would use

"two teams" to transport the drugs to Morocco, and that he would need to "hire men" and

purchase "weapons" for them to protect the cocaine while it traveled across the desert.  Touré

further explained that he would need to purchase at least four 4x4 vehicles to move the drugs

across the desert.  (PSR ¶ 23; GX 109-T at 16-17, 26-29).  Touré added that he had transported

"Indians… Bangladeshis… [and] Pakistanis" through the desert and into Spain using the same

route.  (GX 109-T at 76).

      Touré also indicated that he was able to get official Malian passports.  CS-1 provided

Touré with a photo of a purported criminal associate (the "CA") and explained that the CA

worked for the Colombians.  CS-1 advised that the CA would follow along with Touré's group

to ensure the safe delivery of the cocaine shipment.  CS-1 paid Touré $1,000 for the future

procurement of the passport for the CA.  Touré stated that he would be able to obtain the CA's

passport within 3-4 days after his return to Mali; however, Touré warned that he would only

allow the CA to follow the drug load until the load reached Mali.  (PSR ¶ 24).  Later in the same

meeting, CS-1 indicated that the CA would use the passport "to travel around Africa" to conduct

the business of the Colombians.  (GX 109-T at 71).

      Regarding the passage of the drugs through the desert, Touré stated: "[T]here are

Islamists . . . bearded guys in there.  They're in the bush.  You've gotta give the chiefs

something," indicating that these men needed to be paid in order for the drugs to move safely

through the desert.  CS-1 stated that the Colombians "trust[ed] those people [the Islamists],

because they [had] worked with them" in the past, and that the Colombians "hate[d] the

Americans" because the Americans were "on top of them."  (PSR ¶ 25).  CS-1 further told Touré

that it was for this reason that the Colombians "like[d] to help those people [the Islamists]" because they were their "brothers" and had "the same cause." (PSR ¶ 25; GX 109-T at 38-40). Touré responded that he understood.  (PSR ¶ 25).  Hamada then asked Touré if he knew anyone with whom he could discuss "weapons … something big."  (GX 109-T at 40-41).  Touré responded, "I swear to God I know somebody…. A lot actually.  Even the people there who are in, the bearded guys[.]"  (GX 109-T at 41).  Touré further stated that those people were his "friends" and that he provided them with food and gas.  At a later portion of the same meeting, Touré reiterated that he knew members of al Qaeda and stated that he gave them "fuel . . . food, everything," and paid charity to the mujahedin.  (PSR ¶ 25; GX 109-T at 78).  Hamada then asked Touré if he knew people who could help kidnap Americans.  Touré responded that he knew people in Mali who could do that, and that recently three European citizens had been kidnapped in Mali and were returned for a large ransom.  (PSR ¶ 25; GX 109-T at 79).

At a different meeting later that day, Touré and CS-1 began negotiating the transportation costs for the cocaine.  When CS-1 refused Touré's initial requested payment of $7,000 per kilo, Touré reiterated what was necessary to assure that the drugs would get across the desert.  Touré stated, "You have to buy vehicles.  You have to buy weapons.  You have to buy men because in the bush, over there, those you call Tuaregs, those you call Arabs, they're all there."  When CS-1 asked Touré if he had to pay "the Arabs . . . al Qaeda," Touré responded, "You pay all that, but the Arabs always, those people, you always [pay]."  (PSR ¶ 26).  Touré further explained that the 4x4 vehicles transporting the drugs would need to be new so that they did not break down in the desert and would need to be mounted with "rocket-launcher[s] and large weapons" so that they could fend off attacks by armed bandits.  (GX 110-T at 18, 26, 34-35).

### 3. November 17, 2009 and November 18, 2009 Meetings

Prior to their next meeting, CS-1 and Touré had several recorded telephone calls and also corresponded via e-mail.  During these communications, CS-1 and Touré had further discussions about the transportation costs, with CS-1 indicating that the Colombians could pay $2,000 per kilo in addition to paying expenses.  (GX 111-T at 4-5, attached as Exhibit A).  CS-1 also told Touré that the Colombians would be sending a representative to the next meeting, and asked Touré to bring someone with him who "kn[ew] the road well" and was "in charge of the route along with [Touré]."  (GX 113-T at 2-3; GX 114-T at 1-2, attached as Exhibits B and C, respectively).  Touré responded that he could bring someone and added, "I've made all the necessary contacts and even with our Islamist brothers for the deal to go well."  (GX 616-T, attached as Exhibit D).

On November 17 and 18, 2009, CS-1 and an additional DEA confidential source posing as a member of the FARC ("CS-2") met with Touré and Idriss Abdelrahman in Ghana in meetings that were both audio and video recorded.  Because CS-2 only spoke Spanish, CS-1 translated what CS-2 said into French and Arabic for Touré and Abdelrahman, and vice versa. CS-1 introduced CS-2 as a Colombian who was a member of the FARC, which he described as "a revolutionary group" and a "government, a state within a state" that had "power."  (PSR ¶¶ 27-28).  During the course of these meetings, CS-1 made numerous other statements to Touré and Abdelrahman about CS-2 and the nature and activities of CS-2's organization.  For example, CS-1 told Touré and Abdelrahman that CS-2 "hated Americans" and was "a revolutionary … against capitalism," and that he was "fighting for the same cause."  (PSR ¶ 28; GX 122-T at 9-10, 25-26).  CS-1 later reiterated that CS-2 had "revolutionary ideas" and was "anti-American [and] anti-capitalism," and that CS-2 wanted to work with Touré and Abdelrahman not only to

make money for his organization, but also to give support to "the people" of Touré and Abdelrahman, because they shared "the same cause" and had "the same enemy."  (PSR ¶ 28; GX 122-T at 92-93).  CS-1 further stated that CS-2 had been with his organization for 30 years, and was a "warrior" and a "military man," who was "wanted by the Americans" and who needed to make money through drug trafficking to protect himself and "his militia."   (PSR ¶ 28; GX 122-T at 34, 85, 208; GX 123-T at 23-24, 30).  CS-1 also told Touré and Abdelrahman that CS-2's organization contained over "thirty thousand" people and that they were "an army" of "militia members" that had "rooms full of money" to buy "weapons" and pay for other expenses.  CS-1 further indicated that the organization had "a problem with Colombia" and "with the Americans."  (PSR ¶ 28; GX 122-T at 181; GX 123-T at 23-24).  CS-1 added that the Americans killed CS-2's brother and that CS-2 was "very happy" that Touré and Abdelrahman shared the same "interests" and "goals" and were also "fighting against … the Americans."  (PSR ¶ 28; GX 123-T at 38-39).

During these same meetings, CS-1 further discussed with Touré and Abdelrahman the logistics and payment for the proposed drug shipment.  CS-1 told Touré and Abdelrahman that the drugs would be concealed in "construction materials" and that they could only be extracted by a "chemist" once the drugs reached Spain to protect against theft.  (GX 122-T at 20, 50-51).  CS-1 further told Touré and Abdelrahman that CS-2 wanted all communications about the drugs to occur over secure lines and later provided them with four satellite phones for that purpose.  (GX 122-T at 22-23, 96-97, 170; GX 123-T at 94-95).  After a lengthy discussion about the payment terms, Touré provided CS-1 with a false Malian identification card and birth certificate for the CA and indicated that the false Malian passport had been prepared, as promised at the

October 6, 2009 meeting.  (GX 109-T at 178-79).  CS-2 gave Touré and Abdelrahman $25,000 to purchase a truck to take the drugs from Ghana to Mali.  (GX 123-T at 25-26).

Touré also described his "network" of contacts in the "bush" that would safeguard the drugs as it passed from Mali through the desert and into Morocco, either to Agadir or Laayoune.  (PSR ¶ 27; GX 122-T at 38-39, 54-59).  In the course of explaining how they would transport the cocaine, Touré and Abdelrahman made various statements about their capabilities and their past smuggling experience.  For example, Touré stated that he had "connections" in Morocco with whom he had transported "hashish" in the past who could help smuggle the drugs into Spain.  (GX 122-T at 63-68).  Abdelrahman echoed this, stating that he and Touré had "dealt with a lot of people and … done a lot of work," including transporting "Moroccan chocolate [hashish]" to Libya.  (GX 123-T at 74-76).  Abdelrahman also stated that he was part of a group of eleven armed fighters who could protect the load, and that he and Touré had "cars, the power and the weapons … in the desert."  (GX 122-T at 114; GX 123-T at 35).  Touré and Abdelrahman further stated that they had "crews," "bases," "units," "military men," and "weapons" that would support the transport of the cocaine.  (PSR ¶ 29; GX 123-T at 35).  Touré added that Abdelrahman was "a military man himself … a general."  (PSR ¶ 29; GX 123-T at 37-38).

By the conclusion of the meetings, Touré and Abdelrahman had agreed to transport 50 kilos of cocaine for CS-2's organization as a test run, with the promise of doing additional shipments of larger amounts if the first load was successful.  (PSR ¶¶ 27, 29).

4.  December 2009 Meetings and Arrest

On December 13 and 14, 2009, Touré and Abdelrahman again met with CS-1 and CS-2 in Ghana in meetings that were both audio and video recorded.  At the December 13 meetings, Touré gave CS-1 the false Malian passport for the CA that had been completed.  Touré and Abdelrahman also continued to discuss the terms of their agreement to transport cocaine for CS-

8

1 and CS-2.  (PSR ¶ 30).  When CS-1 offered only an additional €15,000 to complete the

purchase of the truck, Touré became so frustrated with the progress of the negotiations that he

told Abdelrahman in Songhai that they should abandon the deal and return to Mali.  (GX 133-T

at 23-24).  Touré and Abdelrahman resumed their negotiations at the December 14 meeting.  At

that meeting, CS-1 told Abdelrahman that CS-2 was a "military man" who was with a

Colombian "organization" that was being "fucked by the Americans."  (PSR ¶ 30; GX 135-T at

36).  Touré told CS-1 that he had "brought one of the al Qaeda guys here" to serve as the driver

of the truck carrying the drugs.  (PSR ¶ 30; GX 135-T at 22).  Touré and Abdelrahman reiterated

that they a contact in Morocco with whom they had smuggled "hashish" for "years and years,"

and that Touré had also transported "Pakistanis" and "Indians" into Spain.  (GX 135-T at 52-60).

Touré and Abdelrahman also discussed how they would modify the truck and add a cover load of

oranges to conceal the drugs.  (GX 135-T at 65-70).

     Using money advanced to them by CS-1 and CS-2, Touré and Abdelrahman ultimately

purchased the truck.  (PSR ¶ 31).  On December 16, 2009, Touré and Abdelrahman were arrested

by members of the Ghana Narcotics Control Board (NCB) in a hotel room in Accra, Ghana,

along with Mohammed Touré, the nephew of Harouna Touré.  Issa was arrested later by the

NCB at a different hotel in Accra, Ghana.  Issa, Touré, and Abdelrahman were later turned over

to DEA agents.  (PSR ¶ 32).

     5.  <u>Post-Arrest Statements</u>

     On December 17, 2009, Issa, Touré, and Abdelrahman were *Mirandized* and interviewed

by DEA agents on the flight from Ghana to the Southern District of New York.  (PSR ¶ 33).

Among other things, Issa stated that he had previously talked to Touré about his connections in

the desert and that Touré knew a lot of people; that Touré had weapons and used Tuaregs and

Arabs to assist in the transportation of merchandise; that Touré had assisted other Arabs with safe passage through the desert; and that Touré told CS-1 that his people would protect the narcotics as it went through the Salafist regions of North Africa.  (PSR ¶ 34).

Among other things, Touré stated that CS-1 asked to him to bring a member of al Qaeda to a future meeting to ensure that he was serious about transporting the cocaine through the desert, and that he had agreed and brought Abdelrahman to subsequent meetings in Ghana with CS-1 and CS-2.  Touré also stated that he knew CS-1 and CS-2 worked for the FARC and that the cocaine belonged to the FARC.  Touré also advised that the truck that was supposed to be used to transport the cocaine had been stored in a garage in Accra where the tires were going to be replaced, but he did not know where the truck was at that time.  (PSR ¶ 35).

Among other things, Abdelrahman stated that before the meeting, Touré instructed Abdelrahman to say he was al Qaeda if CS-1 and CS-2 asked Abdelrahman so that they would be willing to pay for the transportation for the cocaine.  Abdelrahman said that he was not a general, but that Touré told him to say that during the meeting with CS-1 and CS-2. Abdelrahman further stated that in order to transport merchandise through northern Mali, it is necessary to pay others so that the merchandise is not stolen.  Abdelrahman also stated that he believed Touré had transported narcotics in the past.  Abdelrahman also stated that the truck that was to be used to transport the cocaine was stored in a garage in Accra, Ghana, and was purchased for 13,700 CFA.  (PSR ¶ 36).

## B.    The Defendants' Guilty Pleas

On April 17, 2012, the defendants pled guilty to Count Two of the Indictment, which charged them with conspiring to provide material support to the designated Foreign Terrorist Organizations the FARC, AQIM, and Al Qaeda.  Both defendants pled guilty pursuant to plea

agreements that allow them to argue that the terrorism enhancement pursuant to § 3A1.4 of the Guidelines should not be applied.  During their plea allocutions, the defendants admitted that they had agreed with others to assist in the transport of drugs on behalf of an organization that engaged in terrorist activity.  The Government further proffered that the organization was represented to the defendants to be the FARC.

### C.    The Presentence Investigation Report and *Fatico* Hearing

On July 12, 2012 and July 13, 2012, the Probation Office issued its final Presentence Investigation Reports ("PSRs") for Touré and Abdelrahman, respectively.  The PSRs contain the same Guidelines calculation as the plea agreements, yielding an offense level of 35, a Criminal History Category of VI, resulting in a Guidelines range of 292 to 365 months' imprisonment, which is capped at 180 months as a result of the statutory maximum penalty for an offense under Title 18, United States Code, Section 2339B.  In determining the appropriate Guidelines range, the Probation Office also applied the terrorism enhancement pursuant to § 3A1.4 of the Guidelines.  (*Id.* ¶¶ 50 (Touré) and 46 (Abdelrahman)).  The Probation Office ultimately recommends a sentence of 60 months' imprisonment for both defendants.  (*Id.* at 26).

In light of the objections that both defense counsels raised with the facts contained in the PSRs, a *Fatico* hearing was held on September 24, 2012 and September 25, 2012.  At the hearing, the Government called two linguists—Martin Hoffman and Isabelle Duchesne—who prepared the French portions of the Government's transcripts, and Special Agent Bronwyn Haley, who testified about the defendants' post-arrest statements.  The defendants called their own linguist, Amy Hanna.  Touré also testified on his own behalf.

## ARGUMENT

### A.      The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id*. § 3553(a)(2); "the kinds of sentences available," *id*. § 3553(a)(3); the Guidelines range itself, *see id*. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id*. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id*. § 3553(a)(6); and "the need to provide restitution to any victims," *id*. § 3553(a)(7).  *See Gall* v. *United States*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B)      to afford adequate deterrence to criminal conduct;

> (C)      to protect the public from further crimes of the defendant; and

      (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 128 S. Ct. at 596 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita* v. *United States*, 127 S. Ct. at 2464. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597.

**B.**    **The Terrorism Enhancement Applies to Both Defendants**

The Government submits that the terrorism enhancement, found in the Guidelines at Section 3A1.4(a) (the "Terrorism Enhancement"), plainly applies to both defendants based on their discussions during the recorded meetings and calls, the defendants' post-arrest statements, the testimony elicited at the *Fatico* hearing, and the defendants' admissions at their guilty pleas. Accordingly, the Court should adopt the conclusion of the Probation Department and apply the Terrorism Enhancement to both defendants, as it did with their co-defendant, Oumar Issa.

1.   <u>Applicable Law</u>

The Terrorism Enhancement applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," *see* U.S.S.G. § 3A1.4(a), which is "an offense that—(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of—(i) section . . . 2339B (relating to providing material support to terrorist organizations) . . . ." 18 U.S.C. § 2332b(g)(5), cited in U.S.S.G. § 3A1.4, comment. (n.1); *see United States* v. *Awan*, 607 F.3d 306, 311 (2d Cir. 2010); *United States* v. *Salim*, 549 F.3d 67, 76-79 (2d Cir. 2008).  Under the Guidelines, if the crime of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism," the sentencing court must increase the defendant's offense level by 12 or to level 32, whichever is greater, and must increase the defendant's Criminal History Category to VI.  *See* U.S.S.G. § 3A1.4.  The Second Circuit has recognized that "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."  *United States* v. *Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

In *United States* v. *Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit held that the two prongs of the Terrorism Enhancement—namely, the "involved" and "intended to promote" prongs—are independent and have separate meanings.  "[A] defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime."  *Id.* at 313-14; *see also United*

14

*States* v. *Stewart*, 590 F.3d 93, 138 (2d Cir. 2009). With respect to the second prong, the Second Circuit has held that the "intended to promote" prong "applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." *Awan*, 607 F.3d at 314.

The *Awan* Court also made clear that the Terrorism Enhancement does not depend on the defendant's particular motive for committing the offense of conviction, but rather on the goal that the offense was "calculated" to achieve. *Awan*, 607 F.3d at 317 (terrorism enhancement "does not focus on the defendant but on his 'offense,' asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object"). Thus, the commission of an enumerated crime "satisfies the involved prong of the terrorism enhancement so long as the government shows by a preponderance of the evidence that [the defendant] had the specific intent to commit an *offense* that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.* (internal quotation marks and citations omitted) (emphasis added); *see also United States* v. *Cromitie*, No. 09 Cr. 558 (CM), 2011 WL 2693293, at *5 (S.D.N.Y. June 29, 2011) ("The defendant's motive is simply not relevant. Rather, the relevant question is whether the defendant knew that the offense was so calculated.") (internal quotations and citations omitted).

      2. <u>Discussion</u>

As with Oumar Issa, Touré's and Abdelrahman's agreement to help the FARC transport cocaine satisfies the "involved" prong identified in *Awan*. First, there is no dispute that the crime to which both defendants pled guilty—material support to a terrorist organization—is an enumerated statute under 18 U.S.C. § 2332b(g)(5). Second, the crime of material support to the

FARC, as charged here, constituted an offense calculated to influence or affect or to retaliate against the conduct of a government.  Although the defendants contend that the Government cannot establish this second element of the enhancement based solely on their admissions at their guilty pleas (*see* Def. 7/5/12 Ltr.), there is other evidence in the record indicating that the defendants understood that the Colombian organization with which they were dealing intended to use the money from the drug shipment to engage in violent retaliatory attacks against the American government.  Accordingly, the Terrorism Enhancement should be applied to both.

Touré first became aware of the goals and methods of the Colombian organization at the meetings on October 6, 2009.  When Touré stated that he needed to pay the "Islamists" in the desert to ensure safe passage of the drug load, CS-1 responded that that the Colombian organization "trust[ed] those people, because they [had] worked with them" in the past, and that the Colombians "hate[d] the Americans" because the Americans were "on top of them."  (PSR ¶ 25).  CS-1 further told Touré that it was for this reason that the Colombians "like[d] to help those people [the Islamists]" because they were their "brothers" and had "the same cause." (PSR ¶ 25; GX 109-T at 38-40).  Touré responded that he understood.  (PSR ¶ 25).  Hamada later asked Touré if he knew anyone from al Qaeda.  Touré responded that he did, and that he brought them "food" and "fuel" and paid charity to the mujahedin.  (GX 109-T at 78).  These statements clearly imparted to Touré, and Touré understood, that the Colombian organization wanted to work with the Islamist radicals in the desert – i.e., al Qaeda – because they shared the same cause of striking back against the United States.  Moreover, Touré testified at the *Fatico* hearing that he was told by Hamada to tell CS-1 that he knew members of al Qaeda because CS-1's organization wanted to work with them.  (*See* 9/25/12 Tr. at172, 177).  Even assuming for the sake of argument that Hamada did tell him this, which the Government disputes, Touré knew that the

Colombian organization wanted to work with a terrorist organization with a well-established agenda to attack the United States.[3]

Touré also knew that the Colombian organization was violent and wanted to engage in weapons transactions and kidnappings.  At one point in the meeting, Hamada asked Touré if he knew anyone with whom he could discuss "weapons … something big."  (GX 109-T at 40-41).  Touré responded, "I swear to God I know somebody….  A lot actually.  Even the people there who are in, the bearded guys[.]"   (GX 109-T at 41).  Later on, Hamada asked Touré if he knew people who could help kidnap Americans.  Touré responded that he knew people in Mali who could do that, and that recently three Belgian citizens had been kidnapped in Mali and were returned for a large ransom.  (PSR ¶ 25; GX 109-T at 79).  These discussions leave little doubt that Touré was aware not only that the Colombian group wanted to retaliate against the United States, but also that they were prepared to engage in violent actions, including kidnapping, to do so.

Touré's assertion at the *Fatico* hearing that the discussion about the Belgian kidnapping was a miscommunication, and that he thought Hamada was asking to be brought to the place where the kidnapping took place, is simply implausible.  (9/25/12 Tr. 165-66).  There is absolutely no reason why anyone would request to visit the place where someone was kidnapped, lest they be kidnapped themselves.  Moreover, context of the discussion makes it

---

[3]  Touré's testimony that the only thing he knew about al Qaeda was that they are "bad people" (*see* 9/25/12 Tr. at 227-28) was evasive and should not be credited.  First, Touré refused to elaborate on what he meant by "bad people."  (*See id*.)  Second, he told the Probation Office in his PSR interview that he knew al Qaeda had attacked the United States.  (PSR¶ 41).  Third, Touré was familiar with kidnappings carried out by AQIM members in North Africa.  In a recorded call with CS-1 on November 30, 2009, CS-1 asked Touré whether a recent kidnapping of Spanish citizens in Mauritania would affect the drug shipment.  Touré responded that it would not, and accurately noted that the kidnapping (which was reportedly carried out by AQIM on the road from Nouakchott to Nouadhibou on the coast of Mauritania) took place in a part of Mauritania that was not close to the drug route.  (*See* GX 129-T at 2, attached as Exhibit E; Ex. F).

clear that the participants were discussing the possibility of getting paid money for a kidnapping in addition to the drug shipment.  Touré, himself, stated more than once that the people who kidnapped the Belgians were paid "two billion," to which CS-1 replied, "[t]hat's better than what we're doing."  (GX 109-T at 79-80).  Accordingly, the evidence from the recorded meetings supports that Touré knew that the Colombians were interested in kidnapping Americans as a way to retaliate against the United States.

Many of these same points were reiterated to Touré and Abdelrahman at the meetings on November 17, 2009 and November 18, 2009.  At those meetings, CS-1 introduced CS-2 as a Colombian who was a member of the FARC,[4] which he described as "a revolutionary group" and a "government, a state within a state" that had "power."  (PSR ¶¶ 27-28).  CS-1 also told Touré and Abdelrahman the following about CS-2 and his organization:

- CS-2 "hated Americans" and was "a revolutionary … against capitalism," and was "fighting for the same cause."   (PSR ¶ 28; GX 122-T at 9-10, 25-26).

- CS-2 had "revolutionary ideas" and was "anti-American [and] anti-capitalism," and wanted to work with Touré and Abdelrahman not only to make money for his organization, but also to give support to "the people" of Touré and Abdelrahman, because they shared "the same cause" and had "the same enemy."  (PSR ¶ 28; GX 122-T at 92-93).

- CS-2 had been with his organization for 30 years, and was a "warrior" and a "military man," who was "wanted by the Americans" and who needed to make money through drug trafficking to protect himself and "his militia."   (PSR ¶ 28; GX 122-T at 34, 85, 208; GX 123-T at 23-24, 30).

_____

[4]  The Government submits that the record clearly supports that CS-1 said the word "FARC" at page 15 of the transcript of the November 17, 2009 meeting.  (GX 109-T at 15).  The Government's expert, Mr. Hoffman, who is highly experienced in transcribing and translating French language audio recordings, confidently testified that he heard the word "FARC" at that portion of the recording.  (See 9/24/12 Tr. at 12, 23-24, 27, 33).  By contrast, the defense expert, Ms. Hanna, who had virtually no experience working with audio recordings, testified that she "heard a word … [but] wasn't sure what it was."  (See 9/24/12 Tr. at 134-35, 145).  The Court should credit Mr. Hoffman's testimony.  In addition, Special Agent Haley testified that Touré stated in his post-arrest statements that he understood that CS-1 and CS-2 were affiliated with the FARC.  (9/24/12 Tr. at 72-73).

- CS-2's organization contained over "thirty thousand" people and that they were "an army" of "militia members" that had "rooms full of money" to buy "weapons" and pay for other expenses.  (PSR ¶ 28; GX 122-T at 181; GX 123-T at 23-24).

- CS-2's organization had "a problem with Colombia" and "with the Americans." (PSR ¶ 28; GX 122-T at 181).

- The Americans killed CS-2's brother and CS-2 was "very happy" that Touré and Abdelrahman shared the same "interests" and "goals" and were also "fighting against … the Americans."  (PSR ¶ 28; GX 123-T at 38-39).

For Touré, these statements reinforced and expanded what he already knew about the anti-American agenda of CS-2's organization from the October 6, 2009 meeting.  For Abdelrahman, these statements, combined with what Touré told him prior to the meeting, provided the basis for his understanding that the purpose of the drug shipment was to further the goal of CS-2's organization of fighting against the United States.

As an initial matter, although many of these statements were made in French, the Government submits that the record clearly indicates that Abdelrahman understood French well enough to comprehend what was being discussed.  First, Special Agent Haley testified at the *Fatico* hearing that she communicated with Abdelrahman in French during his post-arrest interview, and that Abdelrahman understood her (and vice versa) and gave full responsive responses to her questions.  (9/24/12 Tr. at 74, 77-78, 114).  Second, the recorded meetings are full of instances where Abdelrahman either speaks in French or where it is clear from context that Abdelrahman understood the French conversation.  The following are some examples:

- When he was first introduced to CS-1 and CS-2 at the November 17, 2009 meeting, Abdelrahman told CS-1, "I know Arabic and French."  (GX-122T at 7).

- Abdelrahman explains to CS-1 in Arabic what Touré has been saying in French. (GX-122T at 29, 46).

- Abdelrahman explains to Touré in Songhai what CS-1 has been saying in French. (GX-122T at 133-34, 159; GX-123T at 12; GX-132T at 81).

19

- Abdelrahman speaks in French.  (GX 122-T at 13; GX-132T at 65-67; GX 135-T at 58-60).

Accordingly, the record is more than sufficient for the Court to conclude that Abdelrahman understood French well enough to comprehend what was said at the recorded meetings about CS-2's organization.

Based on the representations at these meetings, there is no dispute that Abdelrahaman, understood that CS-2's organization was a "revolutionary group"/"militia" comprised of armed "warriors" that was fighting for a "cause."  Indeed, Abdelrahman admitted these facts at his plea allocution.  (*See* Def. 7/5/12 Ltr. at 4) (Abdelrahman admitted (i) that he was told that "[CS-2] was part of a revolutionary group, (ii) that CS-2 was "a warrior and a soldier," (iii) that CS-2 "used weapons" and was "a revolutionary fighting for a cause").  Abdelrahman contests that he understood that he knew that the organization's "cause" was to strike at the United States.  This, however, is contradicted by the record.  At these meetings, CS-1 specifically told Touré and Abdelrahman that CS-2's group was "fighting against the Americans" and considered them an "enemy," and that they wanted to work with Touré and Abdelrahman and their "people," because they shared this same anti-American cause.  (PSR ¶ 28; GX 122-T at 92-93; GX 123-T at 38-39).  Furthermore, CS-1 indicated that CS-2 had a personal stake in retaliating violently against the Americans, because they "killed his brother."  (GX 123-T at 38).  On this basis alone, the Government submits that Abdelrahman understood that by facilitating the narcotics transport, he would be sharing a common cause with CS-2's organization to strike back at the United States.

Furthermore, it was clear to Abdelrahman that CS-1 and CS-2 believed that the "people" with whom he and Touré worked were al Qaeda, and that CS-2's organization wanted to work with al Qaeda because they shared the same anti-U.S. agenda.  Abdelrahman stated in his post-arrest statements that before the meeting on November 17, 2009, Touré had told him to pretend

to be affiliated with al Qaeda so that CS-1 and CS-2 would pay them to transport the drugs.  (Ex. G).  Touré testified similarly at the *Fatico* hearing.  (9/25/12 Tr. at 210-11).  Assuming the truth of these statements, it is clear that Abdelrahman knew before even meeting with CS-1 and CS-2 that they wanted to work with al Qaeda.  Moreover, Abdelrahman further stated in his post-arrest statements that he was familiar al Qaeda and knew that the American military was looking for al Qaeda members and "Salafists" in the Gao region of Mali, indicating that Abdelrahman knew that al Qaeda was fighting against the United States.  (Ex. G).  Based on this understanding, it is appropriate for the Court to infer that when Abdelrahman heard that CS-2 organization was "fighting against the Americans" and shared the "same cause" as his "people," he would have equated the anti-American goals of CS-2's organization with those of al Qaeda.

For these reasons, even accepting Touré's and Abdelrahman's representations that they were completely ignorant about the FARC prior to his meetings with CS-1 and CS-2, it was made clear to both defendants that assisting with the drug shipment would aid the FARC's cause—including its efforts to retaliate against the United States.  Accordingly, the Court should apply the Terrorism Enhancement to both defendants.

### C.      The Court Should Impose a Sentence of 180 Months

In the present case, a sentence of 180 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The defendants pled guilty to conspiring to provide material support to a designated terrorist foreign terrorist organization.  While it is true that Touré and Abdelrahman are not alleged to have been ideologically aligned with the FARC and were driven to commit this crime by financial gain, both defendants agreed to transport a large quantity of narcotics for an organization that engaged in terrorist activity, knowing that it sought to use the profits from the drugs to strike at the United States.

The defendants' crime falls squarely within the class of criminal activities that Congress sought to prohibit when it enacted the Material Support statute.  The Congressional findings accompanying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which enacted Section 2339B, are revealing.  They state in part that "international terrorism is a serious and deadly problem that threatens the *vital* interests of the United States."  Pub. L. 104-132, Sections 301(a)(1) (emphasis added).  Similarly, Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."  Pub. L. 104-132, Sections 301(a)(7).

Consistent with its findings about the seriousness of providing support to designated terrorist organizations, Congress did not require that the provider of support share the ideological goals of the terrorist organization.  And this clearly was not an oversight.  While it is true that terrorist organizations such as the FARC derive some portion of their support from ideological sympathizers, it is equally true that these organizations receive crucial support from individuals such as the defendant, who provide their support in the opportunistic pursuit of financial gain. Regardless of the motivation, however, the same effect is achieved.  The terrorist organization gains additional resources to further its terrorist activities.  Accordingly, whether the defendants were motivated by ideology or financial gain, their offense is equally serious, and a sentence of 180 months in this case would adequately reflect the seriousness of the defendants' crime.

For the same reason, the Government respectfully submits that the Probation Office's recommended sentence of 60 months' imprisonment is misguided.  Even assuming that the defendants were more concerned with financial gain than targeting the United States, the defendants were convicted of committing an offense that has no requirement that the offender share in the ideological goals of the terrorist organization to which he gave support.  Moreover,

even accepting the Probation Office's premise that the defendants' conduct is more analogous to

a narcotics trafficking case, the sheer quantity of narcotics involved in this case—hundreds of

kilograms of cocaine—counsels in favor of a Guidelines sentence.  Indeed, a narcotics

importation offense involving these quantities would have resulted in a Guidelines range of 168

to 210 months' imprisonment.

      A sentence of 180 months in this case also would facilitate general deterrence.  The

Material Support statute is aimed at individuals who knowingly provide support to designated

terrorist organizations.  The defendants' conduct in this case makes clear why this is so.  The

defendants were willing to engage in illegal activities that they knew would inure to the benefit

of the FARC.  Such terrorist organizations rely on people like the defendants to provide

resources and support across the world.  A Guidelines sentence in this case is necessary to deter

like-minded individuals who may believe that it is permissible to support terrorist organizations

even if they do not consider themselves ideologues or terrorists.

      In addition, the Government also notes that this was not the defendants' first foray into

narcotics trafficking and illegal smuggling.  Touré and Abdelrahman both represented to CS-1

that they had worked with contacts in Morocco for "years and years" to transport hashish, and

that Touré had smuggled "Pakistanis," "Bangladeshis," and other illegal aliens from Mali, across

the desert and into Spain.  (GX 122-T at 63-68; GX 123-T at 74-76; GX 109-T at 76; GX 135-T

at 52-60).   Indeed, contrary to his testimony at the *Fatico* hearing, Touré presented himself as an

experienced trafficker with extensive connections, who was fully capable and willing to transport

the drugs across the desert for the FARC.  This is corroborated by Issa's post-arrest statements—

in which he stated that he believed that Touré the connections to transport the drugs across the

desert, that Touré had weapons and used Touregs and Arabs to transport merchandise, and that

Touré had assisted other Arabs obtain safe passage through the desert—and Abdelrahman's post-arrest statements— in which he stated that he believed that Touré had transported drugs in the past. (Exs. G & H; 9/24/12 Tr. at 76).[5] Furthermore, Touré, like Issa, expressed a willingness to involve himself in violent activities to support the FARC, including procuring weapons and kidnapping Americans. (GX 109-T at 40-41, 78-79).

In sum, a Guidelines sentence of 180 months for both defendants is warranted in this case. Touré and Abdelrahman agreed to help transport hundreds of kilograms of cocaine for a terrorist organization that Congress has deemed to threaten the vital interests of the United States. And they did so knowing that the crime was calculated to further the FARC's efforts against the United States. Such a sentence would reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, and would be sufficient, but not greater than necessary to serve the purposes of sentencing.

---

[5] This view is shared by the Probation Department, which noted the following in Touré's Presentence Investigation Report: "[W]e do not believe that [Touré] is as naïve as depicted. His remarks at the presentece interview that he would dump the narcotics if he was unable to find a buyer for them are dubious considering the constant theme that he had presented of poverty and the need to earn money so that he could survive. His involvement in the offense portrays a much more savvy individual, even when viewing the instant offense from the most conservative of eyes." (Touré PSR at 27).

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the defendants

should be sentenced to a Guidelines sentence of 180 months' imprisonment.

Dated: New York, New York
       October 16, 2012

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York


                         By: _____/s/_____
                              Christian R. Everdell / Edward Y. Kim
                              Assistant United States Attorneys
                              Tel: 212-637-2556 / 2401
                              Fax: 212-637-0097

**AFFIRMATION OF SERVICE**

CHRISTIAN R. EVERDELL, pursuant to Title 28, United States Code, Section 1746,

hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney

for the Southern District of New York.  That, on October 16, 2012, I caused a copy of the

Sentencing Memorandum of the United States to be delivered by ECF and electronic mail to:

| | |
|---|---|
| Michael Hurwitz, Esq. | Zachary Margulis-Ohnuma, Esq. |
| hurwitzm@gmail.com | zach@zmolaw.com |

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: New York, New York
           October 16, 2012

                                                          _____/s/_____
                                                          Christian R. Everdell
                                                          Assistant United States Attorney
                                                          (212) 637-2556

26